IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WANDA ANN LITTLE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 08-cv-1087 |
| v. | ) | |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

CONTI, District Judge

*Introduction*

This is an appeal from the final decision of the Commissioner of Social Security ("Commissioner or "defendant") denying the claims of Wanda Ann Little ("plaintiff") for supplemental security income ("SSI") benefits under title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381-83 and for disability insurance benefits ("DIB") under title II of the SSA, 42 U.S.C.§§ 401-33. Plaintiff contends that the decision of the administrative law judge (the "ALJ") that she is not disabled, and therefore not entitled to benefits, should be reversed and remanded because the decision is not supported by substantial evidence. Defendant asserts that the decision of the ALJ is supported by substantial evidence. The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. The court will deny plaintiff's motion and grant defendant's motion because the decision of the ALJ is supported by substantial evidence.

*Procedural History*

Plaintiff filed the applications for SSI and DIB at issue in this appeal on a protective basis on March 2, 2006, asserting a disability since February 27, 2006 due to plantar fasciitis, depression, anxiety, dizziness and fibromyalgia. (R. at 101, 109, 126.) On May 25, 2006, plaintiff's claims were initially denied. (R. at 69-72.) A timely written request for a hearing before an administrative law judge was filed by plaintiff, and the hearing was held on May 31, 2007. (R. at 25-65.) Plaintiff appeared with counsel and testified at the hearing. (Id.) A vocational expert (the "VE") also testified. (R. at 59-63.) In a decision dated July 13, 2007, the ALJ determined that plaintiff was not under a disability within the meaning of the SSA. (R. at 22.) Plaintiff filed a timely request to review the ALJ's decision, which was denied by the Appeals Council on June 10, 2008 (R. at 1-3.) Plaintiff filed this present action seeking judicial review.

*Plaintiff's Background and Medical Evidence*

*Background*

Plaintiff was forty-one years old at the time of the hearing before the ALJ. (R. at 29.0 She was living with her parents and thirteen-year-old son. (R. at 29.) Plaintiff graduated from school (R. at 29) and worked as a bar waitress, informal waitress and cook helper. (R. at 60.) She last worked on February 27, 2006. (R. at 31.) Plaintiff's activities included personal care which she reported as "[s]o far, so good." (R. at 140.) She does not mow the lawn. (Id.) She cooks as long as she is not too long on her feet. (R. at 38, 140.) She reads (R. at 40), house cleans, "I do what I can when I can" (R. at 141), gardens, but not on "all four" (R. at 140), grocery shops with pain, etc. (R. at 141.) She drives, but becomes sleepy and does not go too far. (Id.)

At the time of the hearing before the ALJ, she was taking, among other medications, Fentanyl patch, oxycodone and Lexipro. (R. at 33-34.) She testified the side effects from the medication included blurred vision, light headiness, trouble thinking and sleepiness. (R. at 35.)

*Medical Evidence*

*Dr. Diana Metzger*

Plaintiff was seen by Diana Metzger, M.D., on September 20, 2005. (R. at 165.) Plaintiff reported that she was having chest pain and tightness that had lasted for approximately two months. (Id.) Her pain went from her mid-chest to her left shoulder and it would come and go for no apparent reason. (Id.) Plaintiff had palpitations and had been experiencing anxiety attacks once or twice a week for the last one to two years. (Id.) Plaintiff reported to Dr. Metzger that she has smoked one pack of cigarettes a day for twenty-five years and she usually has one to two glasses of beer or shots of rum or vodka in a mixed drink a day. (R. at 165-66.) Occasionally, plaintiff will drink up to eight shots of rum or vodka in mixed drinks in a day. (R. at 166.) An exercise EKG was performed. It, however, was stopped due to ischemic EKG changes. (Id.) Plaintiff had intermittent symptoms that did not worsen during exercise and the EKG abnormalities quickly returned to normal. (Id.) Plaintiff returned to Dr. Metzger on October 6, 2005 for a follow-up visit. (R. at 164.) Plaintiff reported that she had symptoms mostly when she was relaxing or lying down. (Id.) Dr. Metzger reported that plaintiff did not have any perfusion defects and that her symptoms were very atypical. (Id.) Dr. Metzger stated that plaintiff's symptoms suggested esophageal reflux and she recommended Prilosec[1] to plaintiff. (Id.) Dr. Metzger noted that plaintiff had excellent pulses in her

---

[1]Prilosec acts to "decrease the amount of acid produced in the stomach. Prilosec is used to treat symptoms of gastroesophageal reflux disease (GERD) and other conditions caused by excess stomach acid. It is also used to promote healing of erosive esophagitis (damage to your

3

lower extremities and she suspected that Trental,[2] which was being taken by plaintiff for leg pain, would not be helpful. (Id.)

### Dr. James Lapcevic

On February 2, 2005, plaintiff reported to James Lapcevic, D.O., her primary care physician, that her pain was a seven out of ten when it was the most severe. (R. at 172.) Plaintiff reported that the pain was in her leg and foot and that it interfered with daily living. (Id.) Dr. Lapcevic decided to continue the cold laser treatment for plaintiff's plantar fasciitis. (R. at 173.) Plaintiff was seen again on February 8, 2005, reporting foot pain that was five out of ten when it was most severe. (R. at 174.) Plaintiff reported mild anxiety and mild depression. (Id.) Dr. Lapcevic found plaintiff to have abnormal mood and affect, but her judgment, orientation, and memory were all intact. (R. at 175.) On March 1, 2005, plaintiff described her pain as nine out of ten and that she reported moderate insomnia. (R. at 178.) Dr. Lapcevic noted that plaintiff had an abnormal shuffling gait with moderate to severe head and neck movement and moderate to severe tenderness of thoracic,

---

esophagus caused by stomach acid)." http://www.drugs.com/prilosec.html (last visited 9/16/2009). Side effects may include: "stomach pain, gas; nausea, vomiting, diarrhea; or headache." (Id.)

[2]"Trental is indicated for the treatment of patients with intermittent claudication on the basis of chronic occlusive arterial disease of the limbs. Trental can improve function and symptoms but is not intended to replace more definitive therapy, such as surgical bypass, or removal of arterial obstructions when treating peripheral vascular disease." http://www.drugs.com/pro/trental.html (last visited 9/16/2009). Side effects may include: "[a]llergic reaction . . ., anxiety, bad taste in the mouth, blind spot in vision, blurred vision, brittle fingernails, chest pain (sometimes crushing), confusion, conjunctivitis (pinkeye), constipation, depression, difficult or labored breathing, dizziness, dry mouth/thirst, earache, excessive salivation, flu-like symptoms, fluid retention, general body discomfort, headache, hives, indigestion, inflammation of the gallbladder, itching, laryngitis, loss of appetite, low blood pressure, nosebleeds, rash, seizures, sore throat/swollen neck glands, stuffy nose, tremor, vomiting, weight change." (Id.)

lumbar and sacral spine (R. at 179.) On March 16, 2005, plaintiff reported that her pain was two out of ten when most severe. (R. at 182.) On March 23, 2005 and again on March 30, 2005, plaintiff stated her pain was seven out of ten. (R. at 184, 186.) On April 8, 2005, plaintiff reported her pain was five out of ten and that she felt her feet had improved. (R. at 188-89.) On May 25, 2005, plaintiff stated that her pain was nine out of ten and that she had anxiety, stress, insomnia and depression. (R. at 197.) On August 29, 2005, plaintiff reported her pain to be ten out of ten and Dr. Lapcevic noted that plaintiff continued to have mild anxiety and moderate depression. (R. at 211-12.)

On January 4, 2006, plaintiff stated that her pain was four out of ten and Dr. Lapcevic found plaintiff's depression and anxiety to be mild. (R. at 246-47.) On January 30, 2006, plaintiff reported that her pain was getting worse, that it was stopping her from working and that it was ten out of ten when standing. (R. at 252.) On April 20, 2006, plaintiff reported her pain to be nine out of ten and that she continued to have anxiety, depression, stress and insomnia. (R. at 361-62.) Plaintiff was taking Lexapro,[3] ArmourThyroid[4] and Percocet.[5] (Id.) Dr. Lapcevic indicated that he had completed

---

[3]"Lexapro is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs). It affects chemicals in the brain that may become unbalanced and cause depression or anxiety. Lexapro is used to treat anxiety in adults and major depressive disorder in adults and adolescents who are at least 12 years old." http://www.drugs.com/lexapro.html (last visited 9/16/2009). Serious side effects may include: "very stiff (rigid) muscles, high fever, sweating, fast or uneven heartbeats, tremors overactive reflexes; nausea, vomiting, diarrhea, loss of appetite, feeling unsteady, loss of coordination; or headache, trouble concentrating, memory problems, weakness, confusion, hallucinations, fainting, seizure, shallow breathing or breathing that stops." (Id.) Less serious side effects may include: "drowsiness, dizziness; sleep problems (insomnia); mild nausea, gas, heartburn, upset stomach, constipation; weight changes; decreased sex drive, impotence, or difficulty having an orgasm; or dry mouth, yawning, ringing in your ears." (Id.)

[4]ArmourThyroid is "taken to replace the body's natural thyroid hormones. Thyroid hormones are also used to prevent and treat goiter (growth or enlargement of the thyroid gland) and along with surgery and radiation therapy in the treatment of certain thyroid cancers." http://www.drugs.com/mtm/armour-thyroid.html (last visited 9/16/2009). Serious side effects

the employability assessment form for plaintiff. (R. at 363.) On July 25, 2006, plaintiff reported her pain to be a six out of ten and she also discussed with Dr. Lapcevic that the Subutex[6] she was taking was causing hangover, nightmares and panic anxiety. (R. at 342-44.) Dr. Lapcevic advised that plaintiff have a sleep lab evaluation and interview with a psychiatrist and rheumatologist. (R. at 344.) On August 8, 2006, plaintiff reported that Subutex was not working for her pain. (R. at 339.) On September 5, 2006 Dr. Lapcevic noted that plaintiff began taking Neurontin[7] at the request of Dr.

---

may include: "an allergic reaction. . .; vomiting; or chest pain, irregular heartbeat, or shortness of breath." (Id.)  Less serious side effects may include: "tremor, nervousness, or irritability; headache; insomnia; diarrhea, changes in appetite, or weight loss; leg cramps; menstrual irregularities; or fever, sweating, or heat sensitivity." (Id.)

[5]Percocet contains both acetaminophen and oxycodone which is used to "relieve moderate to severe pain."   http://www.drugs.com/percocet.html (last visited 9/18/2009).  Serious side effects may include "shallow breathing, slow heartbeat; feeling light-headed, fainting; confusion, unusual thoughts or behavior; seizure (convulsions); or nausea, stomach pain [and] loss of appetite." (Id.)  Less serious side effects may include: "feeling dizzy or drowsy; mild nausea, vomiting, upset stomach, constipation; blurred vision; or dry mouth." (Id.)

[6]Subutex is the brand name for Buprenorphine.  "Buprenorphine is an opioid (narcotic) medication that is similar to morphine, codeine, and heroin.  Buprenorphine is used to treat narcotic addiction."   http://www.drugs.com/mtm/subutex.html (last visited 9/18/2009).  Serious side effects may include: "slow or shallow breathing; feeling light-headed, fainting; confusion, unusual thoughts or behavior; or nausea, stomach pain, low fever, loss of appetite, dark urine, clay-colored stools, jaundice (yellowing of the skin or eyes)." (Id.)  Less serious side effects may include: "headache; stomach pain, nausea, vomiting, constipation; warmth or tingly feeling; increased sweating; weakness; back pain; anxiety, depression; sleep problems (insomnia); or runny nose." (Id.)

[7]"Neurontin is an anti-epileptic medication, also called an anticonvulsant.  It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain.  Neurontin is used alone or in combination with other medications to treat seizures caused by epilepsy in adults and children who are at least 12 years old. Neurontin is also used with other medications to treat partial seizures in children who are 3 to 12 years old.  Neurontin is also used to treat nerve pain caused by herpes virus or shingles."  http://www.drugs.com/neurontin.html (last visited 9 /18/2009).  Serious side effects include: "increased seizures; fever, chills, body aches, flu symptoms; swelling of your ankles or feet; confusion; rapid back and forth movement of your eyes; tremor; or easy bruising." (Id.)  Less serious side effects may include: "dizziness,

Kim and Dr. Cseh. (R. at 335.) In September 2006, plaintiff stated that she was suicidal after taking Neurontin. (R. at 330.) In October 2006, Dr. Lapcevic noted that plaintiff was no longer taking Neurontin and reported no abnormalities in plaintiff's psychological exam. (R. at 325.)

### *Dr. Raymond Dalton*

Raymond Dalton, Ph. D., a state agency psychologist, filled out a psychiatric assessment form on May 2, 2006. (R. at 281.) In the form, Dr. Dalton marked that plaintiff had mild depression and anxious mood. (R. at 284.) Dr. Dalton opined that plaintiff did not have any degree of limitations based upon her depression and anxiety and the depression and anxiety did not appear to be severe. (R. at 291, 293.)

### *Dr. Frank Bryan*

On May 23, 2006, Frank Bryan, M.D., filled out a physical residual functional capacity assessment form for plaintiff. (R. at 294-300.) Dr. Bryan evaluated the limitations plaintiff's diagnoses of planter fasciitis and fibromyalgia created for her. Dr. Bryan found that plaintiff would be able to occasionally lift fifty pounds, stand or walk about six hours a day and sit for about six hours a day. (R. at 295.) Dr. Bryan found no other limitations caused by plaintiff's diagnoses. (R at. 295-300.) It was noted that plaintiff has not been treated by a specialist for either the planter fasciitis or fibromyalgia. (R. at 299.) Dr. Bryan noted that planter fasciitis will respond to appropriate foot wear and treatment does not preclude ambulatory activities. (Id.)

---

drowsiness, weakness, tired feeling; lack of coordination; blurred vision; nausea, vomiting, stomach pain, loss of appetite; diarrhea, constipation; dry mouth; runny or stuffy nose, sore throat; headache; sleep problems Insomnia), unusual dreams; or acne, mild skin rash." (Id.)

*Emergency Room Reports*

On May 29, 2006, plaintiff complained about panic attacks with moderate severity. (R. at 306.) Plaintiff was proscribed Ativan[8] and discharged home. (R. at 307.) On May 31, 2006, plaintiff returned to the emergency room with complaints of heart palpitations, dizziness and difficulty breathing, but no chest discomfort, sweating, fainting or muscle spasms. (R. at 304.) Plaintiff's EKG was normal and her symptoms ended (R. at 305.)  She was discharged home. (Id.)  On September 17, 2006, plaintiff reported to the emergency room with complaints of moderate upper extremity pain in her right and left arm. (R. at 302.) Plaintiff was proscribed Percocet for pain and Zofran[9] for nausea. (R. at 303.)

*Community Guidance Center*

Plaintiff was seen at the Community Guidance Center on August 4, 2006, by Cole McCracken, M.A. (R. at 376.)  Plaintiff reported that she had mood swings and outbursts of anger and irritability that developed after she quit her job and filed for disability. (Id.) Plaintiff complained

---

[8]"Ativan is in a group of drugs called benzodiazepines.  It affects chemicals in the brain that may become unbalanced and cause anxiety.  Ativan is used to treat anxiety disorders." http://www.drugs.com/ativan.html (last visited 9/18/2009).  Serious side effects may include: "confusion, depressed mood, thoughts of suicide or hurting yourself; hyperactivity, agitation, hostility; hallucinations; or feeling light-headed, fainting."  (Id.)  Less serious side effects may include: "drowsiness, dizziness, tiredness; blurred vision; sleep problems (insomnia); muscle weakness, lack of balance or coordination; amnesia or forgetfulness, trouble concentrating; nausea, vomiting, constipation; appetite changes; or skin rash."  (Id.)

[9]"Zofran blocks the actions of chemicals in the body that can trigger nausea and vomiting. Zofran is used to prevent nausea and vomiting that may be caused by surgery or by medicine to treat cancer (chemotherapy or radiation)."  http://www.drugs.com/zofran.html (last visited 9/18/2009).  Serious side effects may include: "blurred vision or temporary blindness; fever; slow heart rate, trouble breathing; anxiety, agitation, shivering; feeling light-headed, fainting; or urinating less than usual or not at all."  (Id.)  Less serious side effects may include: "diarrhea or constipation; weakness or tired feeling; headache; dizziness or drowsiness."  (Id.)

about panic attacks and nightmares, but she denied any suicidal ideation. (Id.) McCracken reported that plaintiff's GAF was 45 at intake and 60 at discharge.[10] (Id.) On October 19, 2006, plaintiff was seen by Dr. William Cseh, a psychiatrist. (R. at 375.) Dr. Cseh assessed plaintiff as having neurovegetative signs of depression, but no suicidal ideation, psychosis or thought disorder behavior. (Id.) Plaintiff reported that her depression is worse in the winter months due to the lack of sunlight and cold weather. (Id.) Dr. Cseh assessed plaintiff's GAF at 52. (Id.) On January 31, 2007, Dr. Cseh examined plaintiff and found that she was not complaining of side effects from the Lexapro, did not have any thought disorder behavior or dangerous ideation and had a GAF of 56-58. (R. at 373.)

On March 30, 2007, plaintiff reported that she was getting good pain control from the Percocet and Fentanyl Patch[11] and that her depression was lifting and that she could continue to function despite her pain. (R. at 372.) On April 26, 2007, plaintiff stated that her pain and

---

[10]The GAF scale, designed by the American Psychiatric Association, ranges from zero to one hundred and assesses a person's psychological, social and occupational function. *Diagnostic and Statistical Manual of Mental Disorders*, (DSM-IV-TR)(4th ed. 2000). A GAF score between 51 and 60 indicates some moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functions (e.g., few friends, conflicts with peers or co-workers). *Id.* (emphasis in original). A score between 41 and 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job). *Id*. (emphasis in original).

[11]"Fentanyl Patch is used for [m]anaging chronic pain in patients who need continuous, around-the-clock narcotic (opioid) pain relief and whose pain cannot be managed by less powerful pain medicines. Fentanyl Patch is a narcotic (opioid) analgesic. It works by binding to receptors in the brain and nervous system used by the body's natural 'pain relievers.'" http://www.drugs.com/cdi/fentanyl-patch.html (last visited 9/18/2009). Serious side effects may include: "weak, shallow breathing; severe weakness, drowsiness, or confusion; cold, clammy skin; or feeling light-headed or fainting." (Id.) Less serious side effects may include: "nausea, vomiting, stomach pain, constipation; dizziness, drowsiness, headache; swelling; or pain or mouth sores where tablet was placed." (Id.)

depression had worsened and Dr. Cseh assessed that unresolved stress caused both her pain and depression symptoms to be more severe. (R. at 371.) Dr. Cseh reported that plaintiff did not voice any self-destructive thoughts or dangerous ideation, was compliant with her treatment and did not have side effects. (Id.) Dr. Cseh reported plaintiff's GAF to be relatively unchanged at 56-57. (Id.)

On November 11, 2006, Cole McCracken ("McCracken"), Ralph May, Psy.D., and Dr. Cseh signed their names to a mental residual functional capacity questionnaire. (R. at 364-68.) The questionnaire notes that plaintiff has panic disorder, mood disorder and agoraphobia and that her GAF was 55. (R. at 364.) It was marked that plaintiff would not be able to meet competitive standards in her ability to be punctual, complete a normal workday or workweek, perform at a consistent pace, accept instructions and criticism, get along with co-workers or peers and deal with normal work stress. (R. at 366.) Plaintiff's symptoms were listed to include decreased energy, anger, mood disturbance, aggressiveness, easy distractibility, mild short term memory impairment, sleep disturbance and severe panic attacks. (R. at 365.) It was reported that plaintiff has a very difficult time responding to stressors and controlling her temper without having angry outbursts. (R. at 367.) The responses on the questionnaire stated that plaintiff would be unable to deal with stress of semiskilled or skilled work, interact appropriately with the general public or maintain socially appropriate behavior. (R. at 367.) All observations in the questionnaire were self-reported by plaintiff or were from observations of in-session behavior. (R. at 366.)

### *Legal Standard*

This court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The court may not undertake a *de novo* review of the Commissioner's decision or reweigh

the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . " 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

### *Discussion*

Under Title XVI of the SSA, a disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c (a)(3)(A). Similarly, a person is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c (a)(3)(B).

In order to make a disability determination under the SSA, a five-step sequential evaluation must be applied. 20 C.F.R. §§ 404.1520, 416.920. The evaluation consists of the following phases: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the

claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents her from performing her past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of her age, education, work experience, and residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).  If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the administrative law judge may find that the plaintiff is not disabled.  Burns v. Barnhart, 312 F.3d 113, 119 (3d Cir. 2002).  The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process.  Id.

In the instant case, the ALJ found plaintiff met the insured status requirements of the SSA through December 31, 2010; and with respect to the sequential evaluation found (1) plaintiff had not engaged in substantial gainful activity since February 27, 2006; (2) plaintiff suffers from fibromyalgia and depression, which are severe impairments, and that medical evidence reflects that her plantar fasciitis and anxiety impairments were nonsevere; (3) plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff cannot return to any past relevant work; and  (5) plaintiff has the RFC to perform light work activity not requiring more than occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, crawling, and climbing ramps, stairs, ladders, ropes, scaffolds and which requires no more than simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-

related decisions, and in general, relatively few work place changes and there were jobs in the national economy that plaintiff could perform. (R. at 11-22.)

Plaintiff raises two main issues:

1. Whether the ALJ failed to provide the proper weight to the opinion of plaintiff's psychiatrist that plaintiff was incapable of competitive employment.

2. Whether the ALJ posed an inaccurate hypothetical question which failed to reflect all plaintiff's functional limitations.

Each of these issues will be addressed.

### *I. Whether the ALJ failed to provide proper weight to the medical evidence*

Plaintiff argues that the ALJ failed properly to consider and discuss the mental residual functional capacity questionnaire form that was signed by Cole McCracken, Dr. May and Dr. Cseh, and in doing so improperly rejected their opinion evidence. The Commissioner will generally give greater weight to the findings and opinions of the claimant's treating physician. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). In making disability determinations, an administrative law judge has a duty to consider the opinions of treating physicians and to give them substantial weight. Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). The administrative law judge cannot employ his own expertise against that of a physician who presents competent medical evidence. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). The opinion of a treating physician, however, is entitled to substantial weight only when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

An administrative law judge who does not afford controlling weight to the opinion of a treating physician must consider various "factors" to determine how much weight to give to the

N/A
N/A

opinion. (Id.) Among those factors are: (i) the length of the treatment relationship and the frequency of examination; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. See 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6). The Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). An administrative law judge "must consider all the medical evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d at 429.

The responses to the questionnaire, which plaintiff argues were not properly weighed, noted that plaintiff was unable to meet competitive standards in dealing with stress, interacting with the public and maintaining appropriate behavior. (R. at 367) In the decision, the ALJ stated:

> On November 10, 2006, Cole McCracken, a therapist associated with Community Guidance Center, completed a mental residual functional capacity questionnaire at the request of Laurel Legal Services (Exhibit 7F). This questionnaire mentioned there were some memory and concentrations (sic) issues but acknowledged no formal testing had been done (Exhibit 7F).
> Therapist McCracken was of the opinion it would be difficult for the claimant to relate to coworkers and supervisors but admitted observations were based upon self-report of the claimant, noting the treatment period had been relatively brief (Exhibit 7F). It is noted the claimant's intake therapist, also Cole McCracken, reported the following: "The mood swings developed after she quit her job and filed for disability due to fibromyalgia" (Exhibit 9F).

(R. at 17.)[12]

---

[12] Plaintiff argues that the ALJ's attributing the opinion to Cole McCracken was misleading, because McCracken, Dr. May and Dr. Cseh all signed off on the assessment. It is not apparent which of the three filled out the form.

Although the ALJ's discussion of the questionnaire was somewhat brief and meager, the ALJ did discuss the opinions contained within the questionnaire and gave reasons why they were discounted. The ALJ pointed out that opinions within the questionnaire were not based on objective medical tests and were mainly taken from plaintiff's own self-reported complaints. The observations also were considered, but the observation period was relatively brief. The ALJ noted that the questionnaire opined plaintiff had limitations in memory, concentration and relating to others. The severity of those limitations, however, was called into question by the contradicting evidence stated above. The ALJ gave reasons why she did not rely on the questionnaire and why she discounted the questionnaire. Although the ALJ referred to the questionnaire only with respect to McCracken, the decision implicates that the rationale would apply to Dr. May and Dr. Cseh who also signed the questionnaire. The rationale did not state that little weight was given to McCracken's opinion because he was not a physician. The rationale given was that there were no objective medical tests and that the observation period was relatively brief. Those reasons are equally applicable to Dr. Cseh's signing off on the questionnaire. The observation periods of Mc Cracken, Dr Cseh and Dr. May were essentially similar and were relatively brief – the third reason given for the weight afforded the questionnaire.

Plaintiff argues that the only evidence cited by the ALJ that was contradictory of the questionnaire was the state agency assessment completed by Dr. Dalton, which was out of date and only a check-the-box report. The United States Court of Appeals for the Third Circuit has recognized that RFC reports unaccompanied by written narrative reports may not be substantial evidence. See Mason v Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993); see also Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986). As stated above, however, the report from Dr. Dalton was not the

only evidence relied upon by the ALJ in determining plaintiff's RFC.  The ALJ cited the reports of Dr. Cseh that plaintiff's depression appeared to be lifting and that her mood was improving. (R. at 17-18.)  The ALJ cited the GAF scores of 56-58 reported by Dr. Cseh.  (R. at 18.)  The ALJ also noted that plaintiff's self-reported activities of daily living were inconsistent with a finding of total disability. (R. at 17-19.)  The ALJ  credited plaintiff's self-reported complaints over Dr. Dalton's assessment in finding that she has moderate limitations as to concentration, persistence and pace. (R. at 18-19.)

With respect to plaintiff's criticism of the state agency report as a check-the-box report, it should be noted that the questionnaire that plaintiff seeks to be relied on is also little more than a check-the-box form; albeit, there is some narrative included.  This court cannot reweigh the evidence or  have the ALJ do so when the ALJ in the decision relied on other objective medical evidence in the record.  The court concludes substantial evidence supports the ALJ's assessment of the mental residual functional capacity questionnaire and the weight it was given.

## *II.  Whether the ALJ's hypothetical question failed to reflect all plaintiff's limitations*

Plaintiff's second argument is that the ALJ's hypothetical question to the VE failed to reflect accurately all plaintiff's limitations; namely,  that the ALJ's question did not include limitations in the areas of maintaining regular attendance, completing a normal workweek, performing at a constant pace, accepting instructions and criticisms, getting along with co-workers and peers, dealing with stress, interacting appropriately and maintaining appropriate behavior.  The ALJ's hypothetical question included the limitations of being limited to light work and limited to occasional postural maneuvers and to simple, routine, repetitive tasks not performed in a fast-paced environment with few workplace changes. (R. at 61.)

Where a hypothetical question to a vocational expert accurately sets forth all a claimant's significant impairments and restrictions in activities, physical and mental, as found by the administrative law judge or as uncontradicted on the medical record, the expert's response about the existence of jobs in the national economy which the claimant is capable of performing may be considered substantial evidence in support of the administrative law judge's findings about a claimant's RFC. See Burns, 312 F.3d at 123). Essentially, plaintiff is seeking to have the limitations opined in the mental residual functional capacity questionnaire signed by McCracken, Dr. May and Dr. Cseh to be included in the RFC and hypothetical question. As discussed above, there was substantial evidence to support the ALJ's determination to not give great weight to the questionnaire in making the findings about plaintiff's RFC. The limitations, including simple, routine, repetitive tasks and not in a fast-paced environment, adequately reflect plaintiff's limitations that result from her depression. Under these circumstances, the hypothetical question properly contained all plaintiff's limitations that were supported by the record.

### *Conclusion*

After consideration of the cross-motions for summary judgment and the record as a whole, the court finds that substantial evidence exists in the record which supports the ALJ's conclusion that plaintiff does not have a "disability" as defined in the SSA, and is not entitled to a period of disability, DIB, or SSI payments. Plaintiff's motion for summary judgment is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: September 21, 2009